1
2
3
4                          UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6
7    CROWN ENERGY SERVICES, INC., et al.,        Case No.  19-cv-06334-EMC
8                         Plaintiffs,
                                                 **ORDER DENYING PLAINTIFFS'**
9              v.                                 **MOTION FOR PARTIAL SUMMARY**
                                                 **JUDGMENT AND GRANTING**
10   ZURICH AMERICAN INSURANCE                    **DEFENDANTS' CROSS-MOTION**
     COMPANY, et al.,                            **FOR SUMMARY JUDGMENT**
11
                          Defendants.            Docket Nos. 59, 67
12
13
14
15                         I.        **INTRODUCTION**

16          In this action, Plaintiffs Crown Energy Services, Inc. (d/b/a Able Engineering Services)

17   and Crown Building Maintenance Co. (d/b/a Able Building Maintenance) (collectively "Able")

18   sue Defendants Zurich American Insurance Co., Zurich Services Corp., and Does 1-50

19   (collectively "Defendants") for breach of contract and breach of the implied covenant of good

20   faith and fair dealing.  At issue are Defendants' responsibilities under multiple insurance policies.

21   The motions currently before the Court concern the coverage terms of two commercial general

22   liability ("CGL") policies that Zurich American Insurance Co. ("Zurich") issued to Able starting

23   in 2013.  The parties dispute whether the policies' Self-Insured Retention ("SIR") endorsements—

24   under which Able was responsible for paying the first $500,000 in compensation and defense costs

25   for each incident arising under the CGL policies before Zurich's coverage kicked in—apply not

26   only to Able, but to third-party "additional insureds" as well.

27          Able has moved for summary judgment on its first cause of action, alleging Zurich's

28   breach of contract as to its CGL policies.  Zurich, in turn, has cross-moved for summary judgment

on Able's first cause of action (and Zurich's analogous counterclaim for declaratory judgment on the CGL issue), as well as Able's fifth cause of action, alleging Zurich's breach of the covenant of good faith and fair dealing.  Prior to the motion hearing, the parties completed four rounds of briefing; *see* Docket No. 59 ("Able Mot."), Docket No. 67 ("Zurich Mot."), Docket No. 69 ("Able Reply"), and Docket No. 71 ("Zurich Reply").  For the reasons given below, the Court **GRANTS** Zurich's cross-motion for summary judgment on Able's first claim and **DENIES** Able's motion for partial summary judgment on the same claim.  The Court also **GRANTS** Zurich's motion for summary judgment on Able's fifth claim.

## II.    BACKGROUND

A.    Factual Background

The Able companies "provide stationary engineering" services (such as HVAC repair) and "building maintenance and janitorial services to clients on a nationwide basis."  Able Mot. at 1.  "The scope of Able's activities requires a comprehensive insurance program, inclusive of Commercial General Liability[,] to meet its needs across multiple jurisdictions."  *Id.*  Such coverage was especially important because, in the period relevant to this action, Able had agreed "to defend and indemnify its clients, building owners and property managers, against claims arising from [Able]-provided janitorial and building engineering services."  Zurich Mot. at 1.  Able therefore contracted with Zurich "to buy general liability insurance and to ensure that such insurance covered [Able's] clients as additional insureds on a primary, first-dollar basis."[1]  *Id.*  From April 2013 until April 2014, Able was insured under Zurich Policy No. GLO 5747214-00; for the coverage period spanning April 2014 to April 2015, the policy was reissued as GLO 5747214-01.  FAC ¶ 11.  Able also obtained worker's compensation coverage from Zurich during the same period—coverage that is at issue elsewhere in this litigation but not in the pending motions.  *See id.*; Able Mot. at 1.

Prior to Able's agreement with Zurich, Able had maintained a primary insurance policy

---

[1] "Primary insurance refers to the first layer of [insurance] coverage, whereby liability attaches immediately upon the happening of the occurrence that gives rise to liability."  Zurich Mot. at 1 (quoting *Montrose Chem. Corp. v. Superior Court of Los Angeles Cnty.*, 9 Cal. 5th 215, 222 (2020)).

United States District Court
Northern District of California

with another provider in which Able "and its additional insured clients received first-dollar defense and indemnity from the insurance company." Zurich Mot. at 1. Under the new policies with Zurich, "Able maintain[ed] a $500,000 Self-Insured Retention on [its] General Liability Coverage which [wa]s inclusive of defense costs." Able Mot. at 1. The main purpose of this change, as discussed below, was to reduce Able's insurance premiums.

To put the dispute in context, the Court first addresses self-insured retentions generally. "Liability insurance policies often contain a 'deductible' or a 'self-insured retention' (SIR) requiring the insured to bear a portion of a loss otherwise covered by the policy."[2] Croskey et al., Cal. Practice Guide: Insurance Litigation § 7:378 (2020). An SIR (also known as a "retained limit") "refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied *before* there is any coverage under the policy." *Id.* at § 7:384 (emphasis in original). As a result, "a true [SIR] expressly limits the duty to indemnify to liability in excess of a specified amount *and* expressly precludes any duty to defend until the insured has actually paid the specified amount."[3] *Id.* at § 7:385.1 (internal quotation omitted) (emphasis in original). "The effect of a policy provision requiring the insured to retain the first portion of a loss is that the insurer is essentially providing *excess insurance*." *Id.* at § 7:387 (emphasis in original). In sum, "no coverage attaches unless and until the insured becomes legally obligated for a loss in excess of the SIR. Until then, the insurer has *no duty to defend or indemnify*." *Id.* (emphasis in original).

Able notes that, in contrast to a typical primary-insurance policy, an SIR allows the insured "to choose defense counsel and manage its defense costs" during litigation. *See* Able Mot. at 1.

---

[2] Deductibles tend to be "more common in personal liability and first party property insurance" while "SIRs are more common in commercial liability insurance." Croskey et al., Cal. Practice Guide: Insurance Litigation § 7:384 (2020).

[3] "Unless [an SIR] policy provides otherwise, the insured *must bear its own* defense costs until the SIR is exhausted." *Id.* at § 7:387.1 (emphasis in original). A deductible in a traditional insurance policy without an SIR, in contrast, "relates to the damages for which the insured is indemnified, *not to defense costs*. The insurer is fully responsible for defense costs regardless of the amount of the deductible so long as there is a potential for coverage under the policy." *Id.* at § 7:379 (emphasis in original). Another difference between a deductible and an SIR is that a deductible effectively "*reduces* policy limits (e.g., if there is a $500,000 policy limit and a $50,000 deductible, the insured has only $450,000 coverage)" but an insured's "*policy limits* apply *on top of* an SIR (e.g., if the policy limit is $500,000 and there is a $50,000 SIR, after the SIR is exhausted the insured has the full $500,000 coverage)." *Id.* at § 7:384 (emphasis in original).

But the main benefit of an SIR-based policy is that it reduces premium payments.  As the court in *Forecast Homes, Inc. v. Steadfast Insurance Co.*, 181 Cal. App. 4th 1466 (2010), explains, "the primary purpose of an SIR provision is to allow the named insured to contain its insurance costs. As with deductibles, the more risk the named insured claims for itself, the lower the premiums will be."  *Id.* at 1483.

The record here suggests that reducing premium payments (and so incurring greater risk of liability) was, in fact, Able's motivation in contracting with Zurich for the contested CGL policies. In its moving papers, Zurich explains that, prior to its becoming Able's CGL insurer, Able maintained a standard primary-insurance policy that provided Able "and its additional insured clients . . . first-dollar defense and indemnity" with a $10,000 deductible.  Zurich Mot. at 1, 4 (citing Tenero Decl., Exs. 4 and 5).  In 2013, however, Able retained Marsh Risk & Insurance Services ("Marsh") as an insurance broker to contract with Zurich for the SIR-based policy.[4]  *Id.* Soliciting a quote from Zurich on a CGL program, Marsh explained in an email that Able had "previously purchased insurance with relatively low retentions and as a result began to trade dollars with the insurance companies they dealt with."  *Id.* at 4 (quoting Tenero Decl., Ex. 3). Through Marsh, Able thus sought from Zurich a "high retention" program, with options of $250,000 and $500,000 SIR amounts.  *Id.* (quoting Tenero Decl., Ex. 3).

But this new arrangement evidently unnerved some of Able's clients, who would only be indemnified from loss resulting from Able's work if Able in fact paid the potentially high SIR amount under the CGL policies.  In other words, Able's clients, as additional insureds, risked losing the benefit of Zurich policies for costs and losses below the SIR limit.  In communications with Able, for example, Marsh noted that it was "anticipating some push back from certain certificate holders [*i.e.*, clients of Able] who will initially reject the new $500,000 SIR on the GL policy."  *Id.* at 9 (quoting Tenero Decl., Ex. 14 at MARSH-CES-003911).[5]  In discussions with

---

[4] An insurance broker "acts as a middleman between the insured and the insurer . . . whereas an 'insurance agent' is one who represents an insurer under an employment by it."  Zurich Mot. at 3 n.3 (internal quotation omitted).

[5] Zurich reiterates that Able "contractually agreed to procure insurance and to add its clients (and their property managers) as additional insureds on such insurance."  Zurich Mot. at 30.  It further

United States District Court
Northern District of California

United States District Court
Northern District of California

another insurer, however, Marsh expressed hope that "very few[] property manager cert holders will reject Able's SIR status for GL." *Id.* (quoting Tenero Decl., Ex. 15 at MARSH-CES-004522). But in an exchange with Zurich, Marsh again noted that because of Able's adoption of the SIR policy Marsh and/or Able "anticipate[d] some certificate issues" with Able's clients. *Id.* at 30 (quoting Tenero Decl., Ex. 3). Marsh therefore requested of Zurich, in addition to the SIR-based program Able was seeking, "a matching deductible policy" that would serve as a safety net for clients concerned about indemnification through the SIR.[6] *See id.* (quoting Tenero Decl., Ex. 3). In its final quote to Marsh, Zurich offered such a matching deductible policy, the purpose of which "was 'to certify coverage to those of Able's clients who require[d] proof of first-dollar [general liability] insurance.'" *Id.* at 8 (quoting Tenero Decl., Ex. 8).

In subsequent discussions among the companies, Zurich explained to Marsh that, with respect to Able's prospective CGL policy, "Zurich's coverage attaches on top of Able's SIR," which, Zurich added, "should give some comfort to the umbrella carrier." *Id.* at 4 (quoting Tenero Decl., Ex. 6 at MARSH-CES-0028942). After Able and Zurich had agreed on the CGL policy, Marsh conveyed to Able that Zurich was also prepared to "issue an accommodation GL policy for those certificate holders who absolutely reject the high SIR status on the main policy." *Id.* at 8 (quoting Tenero Decl., Ex. 13 at MARSH-CES-003835). But shortly after the 2013 CGL policy had taken effect, one of Able's large clients, the Shorenstein Company, expressed concern to Zurich and Marsh that Able might fail to pay damages under the SIR amount, thereby exposing

---

explains that "[t]hese same contracts required [Able] to verify compliance with these insurance requirements by producing a certificate of insurance." *Id.* Additional insureds "often do not receive the actual endorsement" of the policy confirming their status as such, "but rather are notified by way of a certificate of insurance." *Id.* at 31 (quoting *Pardee Constr. Co. v. Ins. Co. of the W.*, 77 Cal. App. 4th 1340, 1347 (2000)).

[6] A "matching deductible policy" is also known as a "fronting" policy, where the amount of the deductible is equal to the policy's liability limits. *See* Croskey et al., *supra*, at § 1:53.10. In a fronting arrangement, insurers "issue policies that do *not* transfer the risk of loss from the policyholder to the insurer; e.g., where the policyholder or an affiliate . . . *agrees to indemnify* the insurer for any loss paid by the insurer." *Id.* (emphasis in original). Fronting policies can be useful to additional insureds "because the insurance company is responsible in the first instance to pay a loss covered by [the insurer's] policy," while the policyholder "retain[s] the risk (and minimiz[es] the cost of insurance) because the insurer expects to be indemnified for any loss." *Id.* at § 1:53.11.

Shorenstein to additional risk.  *See id.* at 9 (citing Tenero Decl., Ex. 16 at MARSH-CES-003899).

Zurich clarified to Shorenstein that the latter's additional-insured status on the CGL meant that it

would be defended for any covered liability "first by Able within the SIR and subsequently by

Zurich once a claim gets into the excess."  *Id.* (quoting Tenero Decl., Ex. 16 at MARSH-CES-

003898).  When Shorenstein continued to oppose the arrangement, Zurich reiterated that "Zurich's

coverage attaches over Able's SIR and it isn't appropriate for us to guarantee what Able does

within its SIR limits."  *Id.* at 10 (quoting Tenero Decl., Ex. 18 ¶¶ 1-5).  Shorenstein and Able

evidently managed to resolve Shorenstein's concerns in subsequent negotiations among

themselves.  *See id.* at 32.

B.    Procedural Background

      "At issue in this litigation are fifty-five underlying bodily injury claims asserted against

[Able's] clients," *e.g.*, by patrons of client shopping centers who suffered slip-and-fall accidents

due to Able's allegedly negligent janitorial work.  *See* Zurich Mot. at 1.  For example, during the

relevant coverage period Ms. Silvia Neri "slipped and fell in the lobby of a property owned by the

Irvine Company" in Orange County, California.  *See* Able Mot. at 8, 6.  At the time, "Able was

under contract with The Irvine Company to perform janitorial services at the Property," *id.* at 8,

and had "agreed to defend and indemnify The Irvine Company against claims 'arising from or

relating to . . . performance of the Services,'" Zurich Mot. at 12 (quoting Tenero Decl., Ex. 28 at

NERI01800).  "In her lawsuit, Ms. Neri alleged that the Irvine Company negligently maintained

the marble floor near the elevators and that such negligence caused her to fall."  *Id.*  Pursuant to

their agreement, "The Irvine Company tendered defense and indemnity of the *Neri* action to

[Able]," *id.*, which in turn "tendered the lawsuit to Zurich," Able Mot. at 8.  In response, Zurich

"acknowledged the status as additional insured of The Irvine Company under the policy, but it

declined to accept the additional insured tender as Able had not satisfied the $500,000" SIR.  *Id.*

In other words, "Zurich stated that until the SIR had been exhausted, Zurich had no obligation to

defend/indemnify The Irvine Company under its policy as an additional insured."  *Id.*  Able and

the Irvine Company subsequently pursued their own defenses to the *Neri* action.  Zurich Mot. at

13.  The case eventually settled, with Able contributing over $340,000 in combined compensation

and defense costs.  *Id.*

The other representative claims underlying this action follow the same pattern.  *See* Able Mot. at 6-9; Zurich Mot. at 11-17.  "In not one of these cases did [Able] incur and pay $500,000 or more in defense fees, costs[,] and indemnity on behalf of itself and/or an additional insured."  Zurich Mot. at 3.  In all of them "Zurich either failed to provide a coverage decision or adopted the posture that it [was] not required to make a coverage determination and/or contribute to the settlement of claims until Able exhaust[ed] its Self-Insured Retention."  Able Mot. at 9.  The parties do not dispute that "Able has paid the required premiums . . . in full" and, with the exception of the disputed SIR requirements, has otherwise "satisfied all conditions for coverage."  *Id.* at 2; *see also* Zurich Mot. at 8 n.6 (disputing the amount that Able paid in premiums during the coverage period but acknowledging that the premiums had been discharged).

Able originally filed this action in the Superior Court of San Francisco County.  Docket No. 1-1, Ex. 1.  Defendants removed the case to this Court based on diversity jurisdiction.  Docket No. 1.

C.     CGL Policy Terms

The key provisions in the two CGL policies at issue here are substantially identical.[7]  Both policies identify Crown Building Maintenance Co. as the named insured on their first pages.  Docket No. 67-4 ("Tenero Decl."), Ex. 11 at ZUR000001.  The contract's preamble states that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy."  *Id.* at ZUR000037.  It goes on to explain, however, that "[t]he word 'insured' means any person or organization qualifying as such under Section II – Who Is An Insured."  *Id.*  The parties do not dispute any provisions in Section II, but they do contest a number of terms in the policies' supplemental endorsements.  These include Endorsement A, titled "Additional Insured – Automatic":

---

[7] As a result, the Court generally cites only to the earlier of the two policies, GLO 5747214-00. This policy was filed as Docket No. 67-4, Ex. 11.  The later policy, GLO 5747214-01, is filed as Docket No. 67-4, Ex. 12, and the analogous provisions are contained therein.

United States District Court
Northern District of California

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Part**

**A.**      Section **II – Who Is An Insured** is amended to include as an additional insured any person or organization whom you are required to add as an additional insured on this policy under a written contract or written agreement.  Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.**      Your acts or omissions; or

**2.**      The acts or omissions of those acting on your behalf,

In the performance of your ongoing operations or "your work" as included in the "products-completed operations hazard", which is the subject of the written contract or written agreement.

However, the insurance afforded to such additional insured only applies to the extent permitted by law.

*Id.* at ZUR000023; *see also* Able Mot. at 3 (identifying two other "Additional Insured" endorsements that similarly include "All Persons and Organizations Where Required by Written Contract or Agreement").  As explained above, Able was contractually required to add its clients in the underlying actions, property owners and managers, as additional insureds in Able's CGL policies.  And since the underlying actions involve claims for "bodily injury" resulting from Able's "work" (*i.e.*, its janitorial and building-maintenance services), Able's clients have the status of additional insureds under this endorsement.

Other provisions in the policies similarly distinguish between the policies' named insured and additional insureds.  For example, Section IV of the main policy form, concerning "CGL Conditions," contains an industry-standard "Separation of Insureds" clause:

**7.      Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.**      As if each Named Insured were the only Named Insured; and

**b.**      Separately to each insured against whom claim is made or "suit" is brought.

Tenero Decl., Ex. 11 at ZUR000048.

The policies also give prominent place to the SIR endorsement.  Near the top of the endorsement's first page, under the bolded title "Self Insured Retention," the form states:

> **THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
>
> This endorsement modifies insurance provided under the:
>
> **Commercial General Liability Coverage Part**
> **Employee Benefits Liability Coverage Part**
> **Liquor Liability Coverage Part**
> **Stop Gap Employers Liability Coverage Part**
>
> **Under the provisions of this endorsement, you are responsible for payment of all or part of "defense costs" in addition to Self Insured Retention (SIR) Amounts.**

*Id.* at ZUR000058.  The form then contains a schedule of SIR amounts, with several different payment options.  Able selected the first option and set an SIR amount of $500,000:

**SCHEDULE – SELF INSURED RETENTION AMOUNTS**

| You may select only one choice of **Option 1, 2, 3** or **4** below.  In addition, **Option 5** may or may not be selected. | | |
|---|---|---|
| [X] **Option 1** | $ 500,000 | **Per Incident – You Pay Defense Costs Within SIR** |

*Id.*  At the bottom of the schedule, the form elaborates on the implications of this selection:

> The insurance provided by this policy is subject to the following additional provisions, which in the event of conflict with any other provisions elsewhere in the policy, shall control the application of the insurance to which this endorsement applies:
>
> **I.     Your Obligations – Self Insured Retention**
>
> **A.**     The Self Insured Retention (SIR) Amount(s) shown above in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement apply as follows:
>
> **1.     Option 1 Per Incident – You Pay Defense Costs Within SIR**
>
> If **Option 1** is selected, it is a condition precedent to our liability that you make actual payment of "self insured retention" and "defense costs" for each "incident", until you have paid "self insured retention" and "defense costs" equal to the **Per Incident – You Pay Defense Costs Within SIR** amount, subject to the provisions of Paragraph **A.5.** below.

> The **Per Incident – You Pay Defense Costs Within SIR** amount is the most you will pay for "self insured retention" and "defense costs" arising out of each "incident", regardless of:
>
> **a.**      The number of persons of organizations making claims or bringing "suits" because of the "incident"; or
>
> **b.**      The number of coverages applicable to the "incident" under this policy, except for any "defense costs" we may elect to pay.
>
> If any final judgment or settlement and "defense costs" are less than such Self Insured Retention Amount(s), we shall have no obligation to pay "self insured retention" or "defense costs" under this policy.

*Id.* at ZUR000059.  The endorsement thus provides that the SIR "changes the policy," that it "control[s] the application of the insurance" program "in the event of conflict with any other provisions elsewhere in the policy," and that Able's payment of the SIR "is a *condition precedent* to [Zurich's] liability" under the policy (emphasis added).

The endorsement contains a number of other important provisions, including restrictions on who may pay the SIR amount, *e.g.*, if the named insured is unable to discharge it:

> **B.      Payments By Others**
> Payments by others, including but not limited to additional insureds or insurers, do not serve to satisfy your "self insured retention" obligations or your obligations for payment of "defense costs".
> . . .
> **E.      Your Insolvency or Bankruptcy**
> To the fullest extent allowable by law, your satisfaction of the "self insured retention" and any applicable "defense costs", as a condition precedent to our liability, applies regardless of your insolvency or bankruptcy.

*Id.* at ZUR000061.  These subsections emphasize that Able itself, as the policy's named insured, is the only party permitted to satisfy the SIR amount, even in the event of Able's "insolvency or bankruptcy."  The endorsement goes on reiterate Zurich's lack of responsibility under the policy if Able fails to satisfy the requirements of the SIR:

> **II.      Our Rights and Obligations Excess of the Self Insured Retention**
>
> **A.      Self Insured Retention – Your Failure to Respond**

United States District Court
Northern District of California

In the event of your refusal to respond to your obligations for the payment of "self insured retention" or "defense costs" for any reason, we shall not make payments for you, nor in any event shall we be required to substitute for you as respects your responsibility for payment of these "self insured retention" or "defense costs".

**B.** **Damages/Defense Costs Excess of the Self Insured Retention – Per Incident**

We shall be liable only for the amount of covered damages and if applicable, "defense costs" in excess of the Self Insured Retention Amount(s) shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement, subject to the Limits of Insurance and other applicable provisions of our policy. We shall have no obligations under this policy unless you have satisfied your "self insured retention" obligations.

*Id.* at ZUR000063. The provision states that Able's failure to pay the SIR amount "for any reason" absolves Zurich of any "responsibility for payment of these 'self insured retention' or 'defense costs.'"

The SIR form concludes with a series of definitions of "Defense Costs," "Incident," and "Self Insured retention":

**IV.** **Definitions**

**A.** "Defense Costs" means:

Expenses directly allocable to specific claims and shall include but not be limited to all Supplementary Payments as defined under the policy; all courts costs, fees and expenses; costs for all attorneys, witnesses, experts, depositions, reported or recorded statements, summonses, service of process, legal transcripts or testimony, copies of any public records; alternative dispute resolution; interest; investigative services, medical examinations, autopsies, medical costs containment, declaratory judgment, subrogation and other fees, costs or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of a claim or a loss under the policy. However, the fees, charges and costs of a claim service provider are not considered "defense costs".

**B.** "Incident", for purposes of this endorsement only, means:

As defined or used in our policy, an "occurrence", offense, claim, accident, act, error or omission, common cause, disease or any other such event that is or is alleged to be the cause or result of a loss involving the liability coverages of our policy and to which a "self insured retention" applies.

11

**C.**     "Self Insured retention" means:

The amount of amounts which you must pay for all covered damages which you shall become legally obligated to pay because of the coverages included in the policy to which this endorsement is attached, sustained by one or more persons or organizations.

*Id.* at ZUR000064-ZUR000065.  The endorsement's definition of "Self Insured retention" thus purports to limit the SIR's application to damages that "you," the named insured, "become legally obligated to pay" under the CGL policies.

## III.     LEGAL STANDARD

A.     Summary Judgment

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the non-moving party and all justifiable inferences are to be drawn in the non-movant's favor.  *See id.* at 255.

As explained above, the parties' cross-motions for summary judgment call on the Court to interpret Zurich's insurance policies.  The "interpretation of an insurance policy is a question of law."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).  As such, "cases involving interpretation of insurance contracts . . . are particularly amenable to summary judgment."  *N.H. Ins. Co. v. R.L. Chaides Constr. Co., Inc.*, 847 F. Supp. 1452, 1455 (N.D. Cal. 1994) (internal quotation omitted).  "Summary judgment may be inappropriate in a contract case," however, "if there is a dispute over a material fact necessary to interpret the contract."  *United Pac. Ins. Co. v. Kilroy Indus.*, 608 F. Supp. 847, 850 (C.D. Cal. 1985).

United States District Court
Northern District of California

12

B.     Contract Interpretation

"While insurance contracts have special features," the California Supreme Court has emphasized that "they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992).

> The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the mutual intention of the parties. . . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation. A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. Courts will not strain to create an ambiguity where none exists.

*Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18-19 (1995) (internal quotations omitted); *see also Bank of the W.*, 2 Cal. 4th at 1264-65 (providing a similar overview).

The California Supreme Court has also explained that where policy language is not clear and explicit ambiguities are "resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 667 (1995). "If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist." *Id.* Where ambiguity continues to persist, courts are to "resolve it against the insurer" as a last resort. *See id.*

## IV.     DISCUSSION

Able does not dispute that the SIR endorsement applies where a party brings a claim against Able itself and Able seeks indemnification from Zurich under the CGL policies. The essential issue in the pending motions is whether the SIR endorsement also applies to third-party claims against Able's additional insureds (*i.e.*, its clients as contractual indemnitees). This issue "is common to all of the challenged claims concerning the CGL program" and "is solely a question of policy interpretation." Able Mot. at 1.

Able contends that there is "clear policy language" showing that the SIR endorsement

1    "does not apply to additional insureds," but only to itself as the CGL policies' named insured. *Id.*

2    Zurich counters that Able's satisfaction of the SIR prior to Zurich's duty to defend or indemnify

3    additional insureds is a "condition precedent to coverage" under the policies, and that Zurich

4    "does not owe . . . defense or indemnity" to any insured, including additional insureds, until Able

5    first pays the $500,000 SIR amount to resolve an incident otherwise covered by the policies.

6    Zurich Mot. at 2-3. Zurich further argues that because it has not committed breach of the

7    insurance contracts Able's claim for breach of the implied covenant of good faith and fair dealing

8    fails as a matter of law. *Id.* at 3.

9    A.    Breach of Contract (First Cause of Action)

10         1.    Able's Arguments

11         In arguing that the SIR endorsement applies only to claims for which Able (and not its

12   clients) is liable, Able relies on what it purports to be the plain language of the CGL policies.

13   Able asserts that the distinction throughout the policies between the named insured and additional

14   insureds is crucial; some provisions apply exclusively to the named insured and some only to

15   additional insureds. *See* Able Mot. at 2. In particular, Able contends that, because the SIR

16   provision is addressed solely to the named insured (*i.e.*, to "you"), "[a] plain reading of the policy

17   leads to the conclusion that only the Named Insured's coverage is affected by the SIR

18   endorsement." *Id.* at 5. Able points out that "the endorsement prevents anyone else, including

19   specifically 'additional insureds,' from making any payments under the SIR." *Id.*; *see also id.* at

20   13 (concluding, from this provision, that the SIR "applies only to claims against the Named

21   Insured"). It also puts special emphasis on the endorsement's definition of the SIR, which refers

22   to "[t]he amount or amounts which **you** must pay for all covered damages which **you** shall become

23   legally obligated to pay because of the coverages included in the policy." *Id.* at 5 (emphasis in

24   original). Able further notes that satisfaction of the SIR is described elsewhere in the policies as

25   "a condition precedent to [Zurich's] liability [requiring] that **you** make actual payment . . . until

26   **you** have paid 'self insured retention' and 'defense costs.'" *Id.* at 13 (emphasis in original).

27   Taking these and similar provisions of the CGL policies together, Able concludes that the import

28

United States District Court
Northern District of California

of the contractual language is that "only Able is subject to the SIR."  *Id.* at 14.[8]  As a result, Zurich breached its duty to defend Able's contractual indemnitees, on a first-dollar basis, from potential liability in the underlying personal-injury claims, and Able is thus "entitled to reimbursement for the costs it assumed in defending these additional insureds."  *Id.* at 15.

        2.      <u>Zurich's Arguments</u>

Zurich likewise contends that the plain text of the policies is unambiguous but in its favor. It devotes most of its attention, however, to apposite caselaw and evidence of the parties' understanding of the SIR endorsement's ramifications for Able's clients.

Zurich focuses first on *Forecast Homes, Inc. v. Steadfast Insurance Co.*, a 2010 decision by the California Court of Appeal, Fourth District, that involved an SIR provision similar to the one in the CGL policies here.[9]  That case involved a housing developer, Forecast, that "contractually required all its subcontractors to defend and hold it harmless against any liability arising out of the subcontractors' work"; to that end, the subcontractors "were required to add Forecast to their general liability insurance policies as an additional insured."  181 Cal. App. 4th at 1469.  Several of these subcontractors obtained CGL coverage from Steadfast, which "later refused to indemnify Forecast when a lawsuit was filed by several homeowners against Forecast for construction defects."  *Id.* at 1469-70.  Steadfast refused coverage because Forecast itself, rather than any of the subcontractors (the named insureds), had paid the SIR amount in the underlying actions, in putative violation of the SIR endorsement's plain terms.  *See id.* at 1470, 1473.  The question on appeal was "*who* is permitted to activate coverage by paying the specified SIR per occurrence amount."  *Id.* at 1472 (emphasis in original).

---

[8] Able also makes the straightforward argument that Zurich owes additional insureds the same duty that it owes its named insureds, *i.e.*, the duty to defend and indemnify on a first-dollar basis. *See id.* at 12; *see also id.* (citing caselaw for the proposition that, in California, "[t]he relationship between [an additional insured] and the insurer is the same as that between the insurer and the named insured").  Because, in Able's view, "the SIR endorsement . . . applies only to claims against Able," "additional insureds would be entitled to primary coverage without reference to the SIR endorsement."  *Id.*

[9] Under California law, "[d]ecisions of every division of the District Courts of Appeal are binding upon . . . all the superior courts of this state."  *Auto Equity Sales, Inc. v. Superior Court of Santa Clara Cnty.*, 57 Cal.2d 450, 455 (1962).  Absent a contrary decision of another Court of Appeal or the California Supreme Court, this Court defers to *Forecast Homes*.

15

As here, the SIR provision in *Forecast Homes* was directed solely to the "[n]amed [i]nsured" policyholders (*i.e.*, to "you"). *Id.* at 1470. In section I, "Self-Insured Retention and Defense Costs—Your Obligations," the policy form stated that "you shall be responsible for payment of all damages and defense costs for each occurrence or offense, until you have paid self-insured retention amounts and defense costs equal to the [p]er [o]ccurence amount shown in the Schedule." *Id.* at 1471 (brackets in original). As here, another policy form also described satisfaction of the SIR as "a condition precedent to [the insurer's] liability" and contained a provision expressly stating that "[p]ayments by others, including but not limited to additional insureds or insurers, do not serve to satisfy the self-insured retention." *Id.* at 1472; *supra*. The endorsement's final section also provided definitions for "[s]elf-insured retention" and "[d]efense costs" almost identical to those in the Zurich policies. 181 Cal. App. 4th at 1471. In *Forecast Homes*, the SIR was defined as "the amount or amounts which you or any insured must pay for all compensatory damages which your or any insured shall become legally obligated to pay." *Id.* (In contrast, the SIR here is limited to "the amount or amounts which you must pay for all covered damages which you shall become legally obligated to pay.") Despite express language to the contrary, Forecast argued that "the endorsements permitted an additional insured to satisfy the SIR through payment of defense costs in the underlying action." *Id.* at 1473.

At the start of its analysis, the *Forecast Homes* court offered a primer on the law of SIRs, explaining that the retention amount "is the insured's initial responsibility and must be satisfied *before* there is any coverage under the policy." *Id.* at 1474 (quoting Croskey et al., *supra*, at § 7:378) (emphasis in original). "It is well recognized," the court explained, "that self-insurance retentions are the equivalent to primary liability insurance, and that policies which are subject to self-insured retentions are 'excess policies' which have no duty to indemnify [or defend] until the self-insured retention is exhausted."[10] *Id.* (internal quotation omitted). Above all, the court

---

[10] The court noted that "[t]he analogy between 'primary' and 'excess' insurance should not be carried too far" since an "SIR is *not* the same as primary insurance for all purposes." 181 Cal. App. 4th at 1474 (quoting Croskey et al., *supra*, at § 7:387) (emphasis in original). But the example the court offers in support of this conclusion, concerning the "horizontal exhaustion rule" and "stacking" of SIRs, is highly specific and irrelevant to the instant case. *See id.*

16

stressed that "an SIR, like any insurance provision, must be enforced according to its plain terms." *Id.* at 1475 (citing *Vons Cos., Inc. v. United States Fire Ins. Co.*, 78 Cal. App. 4th 52, 63-64 (2000)).

Turning to the Steadfast policy, the court held that the "section of the policy regarding *who* can make the payment to satisfy the SIR is clear and unambiguous" in requiring "that *you* [the named insured] make actual payment" and prohibiting "others, including . . . additional insureds," from satisfying the retention amount. *Id.* at 1476 (emphasis and brackets in original). It likewise concluded that the provision in the SIR endorsement warning that "it is a condition precedent to [Steadfast's] liability that *you* [*i.e.*, the named insured] make actual payment of all damages" made clear that only the named insured could pay the SIR amount. *Id.* at 1478 (emphasis in original).

The court also rejected Forecast's argument that the policy was ambiguous (and so had to be construed in the insured's favor) because section IV of the endorsement defined the SIR as the amount that "you or any insured must pay for all compensatory damages which you or any insured shall become legally obligated to pay." *See id.* at 1476-77. Forecast urged that the provision's reference to "any insured" created "ambiguity as to who can pay the SIR." *Id.* at 1477. But the court disagreed, concluding that, "read in context of the entire policy and the intended purpose of the policy," only section I "describ[es] *who* is obligated to pay the SIR," while section IV is "devoted to describing *what* amounts and expenses qualify for the named insured's SIR payment." *Id.* (emphasis in original). In other words, the definition of the SIR in section IV referred to the costs that could be applied against the SIR amount (and included expenses incurred by both the named and additional insureds), but section I provided that only the named insured itself, and not any additional insureds, could pay the SIR amount order to satisfy the endorsement. In support of its conclusion, the court observed that "a broad definition of the amounts qualifying as SIR payments [in section IV] benefits the insured . . . and supports the intended function of the policy." *Id.*; *see also id.* at 1477-78 (noting that an expansive definition of the SIR "was necessary for the parties' reasonable expectations that lawsuits naming only the additional insured would still be covered by the subcontractor's policy").

Finally, the court concluded that whereas SIR endorsements in other cases had been made

17

"subject to the other insurance provisions" in a policy, the SIR in *Forecast Homes* clearly warns that "the terms of the endorsement 'shall control' if there is a conflict with other policy language." *Id.* at 1480; *cf. Vons*, 78 Cal. App. 4th at 62-64 (holding that an "SIR was subordinate to the other insurance provisions" in a policy and that the SIR was at least "ambiguous" in its operation on the rest of the policy).[11]

Zurich proposes several straightforward comparisons between the SIR endorsement in the instant case and the one at issue in *Forecast Homes*. First, both endorsements are titled "Self Insured Retention" and so function as primary liability insurance, with Zurich having no duty to defend or indemnify until the SIR is exhausted. Zurich Mot. at 25. Second, both endorsements expressly state that the CGL policy as a whole "is subject to" the SIR provisions, "which in the event of conflict with any other provision elsewhere in the policy[ ] *shall control the application of the insurance*." *Id.* (quoting Tenero Decl., Ex. 11 at ZUR000059) (italics in original). Third, satisfaction of the SIRs is described in the endorsements as "*a condition precedent*" to Zurich's liability under the policy as a whole. *Id.* (quoting Tenero Decl., Ex. 11 at ZUR000058) (italics in original). Thus, "[s]ince [Able] did not incur or pay defense fees, costs[,] or settlement monies in amounts totaling $500,000 or more in any one of the fifty-five underlying actions, [Able] has failed to satisfy the SIR condition precedent to coverage under the Zurich American policies." *Id.* at 26. And fourth, both endorsements state that, absent the insured satisfying the SIR, the insurer "*shall have no obligations to pay* 'self insured retention' or 'defense costs' under the policy." *Id.* (quoting Tenero Decl., Ex. 11 at ZUR000059) (italics in original). For these reasons, Zurich urges the Court here to enforce the SIR endorsement just as the *Forecast Homes* court did.

Zurich also relies on a 2017 decision from the Indiana Court of Appeals to which it was a party, *Walsh Construction Co. v. Zurich American Insurance Co.*, 72 N.E.3d 957, 958 (Ind. Ct. App. 2017). Both the factual background and the terms of the SIR endorsement in *Walsh* are

---

[11] The court also held that the terms of the SIR endorsement did not violate public policy, as the California "Supreme Court consistently admonishes against rewriting insurance policy language to deny parties their general freedom to contract." 181 Cal. App. 4th at 1482. It further concluded that the policy was not an illusory contract because the "condition of requiring the named insured to pay the deductible amount before coverage is triggered is not a fact or event under [the insurer's] control or discretion," as it must be to find the contract illusory. *Id.* at 1483-84.

nearly identical to those here.  That case involved a general contractor, Walsh, which hired a

subcontractor, Roadsafe, to help construct a highway interchange.  *Id.* at 958.  Roadsafe agreed to

indemnify Walsh for any liability resulting from its roadwork through a Zurich CGL policy;

Roadsafe was the named insured and Walsh was listed as an additional insured.  *Id.* at 958-59.

The policy contained another $500,000 per-occurrence SIR, satisfaction of which by the named

insured (as here) was a "condition precedent to coverage" under the rest of the policy and which

"control[led] the application of the insurance" "in the event of conflict with any other provisions

elsewhere in the policy."  *Id.* at 959.  The only pertinent difference between the SIR endorsement

in *Walsh* and that in the instant case is that the *Walsh* policy (like the *Forecast Homes* policy)

defined the SIR to mean "the amount of amounts which *you or any insured* must pay for all

compensatory damages and 'pro rata defense costs' which *you or any insured shall become legally*

*obligated to pay*."  *Id.* at 960 (italics in original).  (Again, the SIR here is defined as "the amount

or amounts which you must pay for all covered damages which you shall become legally obligated

to pay.")  In the action underlying the *Walsh* case, a man was injured while driving his car through

a construction zone and sued Walsh for negligence.  *Id.*  After Roadsafe failed to provide a

defense to the underlying action, Walsh requested that Zurich defend and indemnify it against the

plaintiff; Zurich refused, however, arguing that it was not liable because Roadsafe had yet to pay

the SIR amount.  *Id.* at 960-61.

On appeal, Walsh pressed an argument essentially identical to the one that Able offers

here.  Walsh "argue[d] that the SIR endorsement amends only Zurich's relationship to [the named

insured] and that it does not amend Zurich's obligations under the CGL policy with respect to

[additional insureds]."  *Id.* at 962.  Zurich responded, as it does here, "that the SIR amount must be

satisfied before Zurich can have *any* obligations under the CGL policy."  *Id.* (emphasis added).

The issue, which the court described as "a matter of first impression,"[12] was framed as whether "a

---

[12] In a footnote, the court explained that "none of the foreign authority cited by the parties is on all
fours with the instant appeal," citing as the first example *Forecast Homes*.  72 N.E.3d at 963 n.4.
The court correctly characterized the narrow issue in *Forecast Homes* as "whether an additional
insured could invoke an insurer's obligation to defend by paying the SIR amounts in lieu of the
named insured paying those amounts."  *Id.*

self insured retention endorsement to a commercial general liability insurance policy requires the named insured to satisfy the amount of the endorsement, whether on its own behalf or on behalf of an additional insured, before the additional insured may seek to enforce the policy against the insurer." *Id.* at 958.

The court ruled for Zurich, holding that "Zurich's reading of the SIR endorsement properly harmonizes the totality of that document's language and applies the SIR endorsement as it was intended to be applied." *Id.* at 962. Focusing on "the plain language of the instant CGL policy and SIR endorsement," the court seized on the endorsement's definition of the SIR as covering losses that both the named insured "*or any insured must pay* for all compensatory damages and 'pro rata defense costs' which *you or any insured* shall become legally obligated to pay." *Id.* at 963 (emphasis in original). Putting this definition together with the basic features of the CGL policy—*i.e.*, the provisions stating that the named insured's satisfaction of the SIR amount is a "condition precedent to coverage" under the policy and that the endorsement "shall control the application of the insurance" "in the event of conflict with any other provisions elsewhere in the policy"—the court concluded that the SIR applied equally to the named insured and additional insureds. *See id.* at 964. In doing so, the court specifically noted that "there [was] no rational basis to apply the SIR endorsement as a condition precedent to Zurich's coverage of the named insured but not to Zurich's coverage of additional insureds." *Id.*

Additionally, the *Walsh* court held that the SIR's exclusive focus, elsewhere in the endorsement, "on the relationship between Zurich and Roadsafe . . . without concern for additional insureds" was not anomalous—as Able argues here—but rather "consistent with the SIR endorsement having placed the burden to defend additional insureds on Roadsafe." *Id.* The court further observed that its decision was consonant with policy considerations, given that the high SIR amount "enabled [the named insured] to obtain the CGL policy from Zurich at a reduced premium." *See id.*

Finally, Zurich points to the aforementioned emails exchanged among Able, Zurich, Marsh, and certain of Able's clients to show that the parties understood the SIR endorsement to apply to additional insureds under the CGL policies. As a result, the companies appreciated that

Able would assume greater risk under the "high retention program" it was seeking from Zurich than it had been under its earlier primary-insurance policy, which contained only a $10,000 deductible.  *See* Zurich Mot. at 4 (quoting Tenero Decl., Ex. 3).  These communications show, Zurich argues, that Able faced pushback from clients who were reluctant to transition from "being covered under a primary general liability policy with a $10,000 deductible" to now "be[ing] 'covered' first by [Able] under its $500,000 self-insurance and then by Zurich."  *Id.* at 31.  In Zurich's view, the misgivings of Able's clients reached "a fever pitch" with Shorenstein's emails, which conveyed to Marsh that Shorenstein was worried about Able's ability and/or willingness to indemnify Shorenstein for the high SIR amount.  *See id.* at 31-32 (quoting Tenero Decl., Ex. 16 at MARSH-CES-003901).  Additionally, Able's request that Zurich provide it with a matching deductible policy alongside the SIR only makes sense, Zurich argues, as a "fallback strategy in case a client demanded first-dollar defense and indemnity from an insurer," rather than Able.  *Id.* at 32-33.  The communications thus show, Zurich contends, that Able and its experienced insurance broker Marsh fully appreciated the tradeoff Able was making in forgoing a low-deductible primary-insurance policy for the SIR-based program.  *See id.*

      3.   <u>Analysis</u>

Having carefully considered the parties' arguments, the Court concludes that Zurich's analogies to *Forecast Homes* and *Walsh* are persuasive.  Beginning with *Forecast Homes*, the court emphasized that "an SIR, like any insurance provision, must be enforced according to its plain terms."  181 Cal. App. 4th at 1475.  In holding that only the named insured could make defense and indemnity payments in satisfaction of the SIR provision there, the court aptly stressed that the named insured's payment of the SIR amount was clearly characterized as a "condition precedent to [the insurer's] liability" under the policy and that the endorsement stated that "the terms of the endorsement 'shall control' if there is a conflict with other policy language."  *See id.* at 1476-80.  The similarity in policy language and the structure of the SIRs compels the same conclusion here.  In *Forecast Homes*, the SIR endorsement stated that "it is a condition precedent to [the insurer's] liability that you [*i.e.*, the named insured] make actual payment of all damages and defense costs for each occurrence or offense, until you have paid self-insured retention

amounts and defense costs equal to the [p]er [o]ccurrence amount shown in the Schedule." *Id.* at 1472 (brackets in original).  Here, the SIR endorsement is functionally identical, stating that "it is a condition precedent to [the insurer's] liability that you [*i.e.*, the named insured] make actual payment of 'self insured retention' and 'defense costs' for each 'incident', until you have paid 'self insured retention' and 'defense costs' equal to the Per Incident – You Pay Defense Costs Within SIR amount." *See* Tenero Decl., Ex. 11 at ZUR000059.  There is no principled reason to distinguish between these foundational provisions in the *Forecast Homes* policy and the SIR endorsement in the instant case.

Moreover, section I of the Zurich policy states that if Able's liability for a particular incident is less than the SIR amount then Zurich "shall have no obligation to pay 'self insured retention' or 'defense costs' *under this policy*." *See id.* (emphasis added).  That limitation applies to the entire "policy," not merely to the SIR endorsement.  Notably, as described above, the endorsement contains the heading "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." *Id.* at ZUR000058 (bolding removed).  Immediately below this declaration the endorsement explains, "This endorsement modifies insurance provided under the: Commercial General Liability Coverage Part," the "Employee Benefits Liability Coverage Part," the "Liquor Liability Coverage Part," and the "Stop Gap Employers Liability Coverage Part." *Id.*  In other words, the endorsement is described as "chang[ing]" or "modif[ying]" the "policy," *i.e.*, the "insurance" provided under the constituent "Part[s]" of the CGL policies.  As a result, the SIR endorsement's limitation "under this policy" applies to the entire "policy," not merely the endorsement specifically.  Indeed, Able does not dispute that "policy" would refer to the CGL policy as a whole, and not just a particular part of it.

The Court additionally finds *Walsh* persuasive.  There, the court focused on the SIR definition, which provided that the SIR applies to "the amount . . . which you [*i.e.*, the named insured] or any insured must pay," to hold that the endorsement applied to named and additional insureds alike.  *See* 72 N.E.3d at 963.  It also ruled that the endorsement's characterization of "its provisions as a 'condition precedent to coverage' from Zurich" unequivocally conditioned Zurich's responsibilities on the named insured's satisfaction of the SIR amount.  *Id.* at 964.  As a

result, the named insured "assumed all costs and liability for the first $500,000 of any claim that might be made under the CGL policy, regardless of whether that claim was against [the named insured] or an additional insured." *Id.*  The court further offered a sound policy basis for its ruling, explaining that there was "no rational basis to apply the SIR endorsement as a condition precedent to Zurich's coverage of the named insured but not to Zurich's coverage of additional insureds," and that the named insured's broad obligations to additional insureds under the endorsement enabled the named insured "to obtain the CGL policy from Zurich at a reduced premium."  *Id.* at 964.

Able makes much of the fact that the SIR endorsement in *Forecast Homes* and *Walsh* defined the SIR as the amounts "which you or any insured must pay," whereas the endorsement here defines the SIR as the amounts "which you must pay."  But this difference is inconsequential. The phrases pertain to "*what* amounts and expenses qualify for the named insured's SIR payment."  *Forecast Homes*, 181 Cal. App. 4th at 1477.  Nothing renders the SIR entirely inapplicable to additional insureds.  Even if these provisions pertained to *who* can satisfy the SIR (a question the court in *Forecast Homes* decided against the insured), here, unlike *Forecast Homes*, neither the named nor an additional insured paid the SIR amount.  In that regard this is a simpler case than *Forecast Homes*.

Importantly, in the SIR definition at issue here, the phrasing "the amount . . . which you shall become legally obligated to pay" encompasses damages of additional insureds since Able contractually "agreed to defend and indemnify its clients . . . from liability arising from or relating to [Able's] janitorial services."  Zurich Reply at 10.  Under California law indemnity is "the obligation resting on one party to make good a loss or damage another party has incurred"—an obligation that "may be expressly provided for by contract."  *See id.* at 10 (quoting *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal.3d 622, 628 (1975)); *see also* Cal. Civ. Code § 2772 ("Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person.").  Able's contractual obligations to their clients are inscribed within the text of the CGL policies by way of the Additional Insured endorsement, which defines an additional insured to include "any person or organization whom

[Able is] required to add as an additional insured on this policy under a written contract or written agreement." *See* Tenero Decl., Ex. 11 at ZUR000023. As a result, the SIR definition here "subsumes settlements or judgments [Able] pays on behalf [of] its additional insured clients" in substantially the same way as the more emphatic SIR definitions in *Forecast Homes* and *Walsh*. *See* Zurich Reply at 10-11.

At the motion hearing, Able suggested that the SIR definition should be interpreted as applying only to Able's direct, but not its derivative, liability. The endorsement, however, does not make such a distinction, referring in broad terms to "the amount . . . which [the named insured] shall become legally obligated to pay." In accordance with California law, the Court declines to read a significant limitation into the policy that the parties themselves did not see fit to include. *See Forecast Homes*, 181 Cal. App. 4th at 1476 ("We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there.").

From a broader perspective, moreover, it is very difficult to understand why an insurer like Zurich would issue a policy covering additional insureds from the first dollar but indemnifying the named insured only after it has paid a significant SIR. This would mean that additional insureds' rights under the policy exceed those of the named insured. And given the nature of Able's business and the likelihood that third-party claims would be brought against Able's property owner or property manager clients (as opposed to Able itself), the quantum shift from a low deductible to a substantial SIR would be rendered ineffective to the insurer as a practical matter. Able would obtain the windfall of paying a reduced premium while being relieved of its substantial indemnity risks as to its clients. In this regard, Able seeks from Zurich the proverbial something for nothing.

The Court further notes that even if the text of the SIR endorsement was found sufficiently ambiguous to admit of Able's construction of the policy, the negotiations between Able, Zurich, Marsh, and Able's clients offer compelling extrinsic evidence of "the objectively reasonable expectations of the insured," *Montrose*, 10 Cal. 4th at 667 (quoting *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990)). These communications, as described above, indicate that

24

United States District Court
Northern District of California

1  Able understood the heightened risk it was assuming with respect to client indemnitees under the

2  SIR endorsement.  For instance, Able's insurance broker, Marsh, explained to Zurich that Able

3  was tired of "trad[ing] dollars with the insurance companies" Able had previously contracted with

4  to provide a $10,000-deductible CGL policy.  Zurich Mot. at 4 (quoting Tenero Decl., Ex. 3).

5  Marsh thus implied that the high premiums undoubtedly associated with such a policy had proven

6  disagreeable to Able, and that Able was now seeking a "high retention" program that (Marsh

7  acknowledged) would result in "some push back" from Able's clients because of the program's

8  associated risk.  *Id.* at 9 (quoting Tenero Decl., Ex. 14 at MARSH-CES-003911).  The

9  communications strongly suggest that Able adequately perceived the bargain it was striking via

10  the SIR-based policy, which (like all such policies) enabled it to pay "lower premiums" in

11  exchange for "more risk."  *See Forecast Homes*, 181 Cal. App. 4th at 1483.

12       Able argues that Zurich's references "to the negotiations leading up to the policy being

13  issued" show only that "certain of [Able's] customers might reject Able's use of a policy with an

14  SIR," and that the "post-agreement evidence" regarding Shorenstein establishes nothing "more

15  than what Zurich thought it was selling."  Able Reply at 8.  But, as noted above, at least two of the

16  exchanges appear to have included Able, and almost all of them involved Marsh, which was acting

17  as Able's agent during the negotiations.  Able must therefore have been aware of Marsh's

18  numerous references to the certificate problems it and/or Able expected to encounter with Able's

19  clients—problems that do not have a clear basis apart from the clients' concerns about the SIR

20  endorsement's impact on the clients' indemnification as additional insureds.  Similarly, Able's

21  pursuit of a matching deductible policy from Zurich appears nonsensical except as a means of

22  offering anxious clients coverage directly from the insurer, rather than Able itself.  If the SIR

23  endorsement provided such indemnification in and of itself, a matching deductible policy would

24  be wholly redundant (and a waste of Able's money).  The Court declines to interpret the

25  endorsement in a manner that would ascribe such irrational conduct to the prevailing party.

26       In light of the foregoing, the Court **GRANTS** Zurich's motion for summary judgment with

27  respect to Able's claim for breach of contract on the CGL policies and **DENIES** Able's motion for

28  partial summary judgment on the same issue.

**B.**     Breach of the Implied Covenant of Good Faith and Fair Dealing (Fifth Cause of Action)

In its motion for summary judgment on Able's fifth cause of action, Zurich argues that the claim fails as a matter of law because "a bad faith claim cannot be maintained unless policy benefits are due," *i.e.*, unless it has committed breach of contract.  *See* Zurich Mot. at 37.  Zurich points to the California Supreme Court's decision in *Waller v. Truck Insurance Exchange, Inc.*, where the Court held that "if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing."  *See* 11 Cal. 4th at 36 (emphasis in original).  This limitation exists because "the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement."  *Id.*  Thus, in the absence of an underlying contractual right, "the implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings."  *Id.* (internal quotation omitted).  Able has not identified any relevant authority that contravenes this principle.

As the Court has granted Zurich's cross-motion for summary judgment on Able's breach of contract claim, it also **GRANTS** Zurich's motion for summary judgment on Able's bad faith claim.

Even if the Court had ruled against Zurich on the breach of contract issue, Able's bad faith claim would still fail for the independent reason that Able has not produced evidence showing that Zurich's conduct went beyond a mere refusal to defend or indemnify based on a simple dispute over policy interpretation.  Such conduct is inadequate to proving breach of the implied covenant of good faith and fair dealing.  "To establish a bad faith claim, the insured must show that (1) benefits due under the policy were withheld and (2) the reason for withholding the benefits was unreasonable or without proper cause."  *Berns v. Sentry Select Ins. Co.*, 766 Fed. Appx. 515, 517 (9th Cir. 2019) (quoting *Century Sur. Co. v. Polisso*, 139 Cal. App. 4th 922, 949 (2006)).  The second element of the test requires that the insured show "more than just an insurer's contractual breach or mistaken judgment."  *Id.*  Rather, the insurer must go beyond "a mere 'honest mistake, bad judgment, or negligence,'" and commit "a 'conscious and deliberate act, which unfairly

26

frustrates the agreed common purposes and disappoints the reasonable expectations of the other party.'" *Id.* (quoting *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001)); *see also* Croskey et al., *supra*, at § 12:837.5 (stating that "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability . . . is not liable in bad faith even though it might be liable for breach of contract").

In its moving papers, Able devotes a single paragraph to the implied covenant issue, where it hurriedly posits nine examples of "genuine disputes of material fact as to whether Defendants breached their implied covenant of good faith and fair dealing." Able Reply at 10. These include Zurich's conduct in "inventing spurious grounds for avoidance of coverage without regard to the pertinent policy language, facts, or law"; "not attempting in good faith to effectuate a prompt, fair and equitable resolution to Plaintiffs' claims"; and "failing to provide promptly a reasonable explanation of the basis relied on, in relation to the facts or applicable law, for their failure to provide coverage." *Id.* Most of these contentions simply recapitulate Able's basic argument in support of its failed breach of contract claim—*i.e.*, that Zurich refused to defend and indemnify Able in the underlying personal-injury actions. Otherwise, there is nothing in the record (as the parties have presented it here) to suggest that Zurich's conduct in denying coverage to Able's clients in the underlying actions went beyond, at worst, an "honest mistake, bad judgment, or negligence." *See Berns*, Fed. Appx. at 517. Able has therefore failed to carry its burden in proving that Zurich's "reason for withholding the benefits was unreasonable" as a matter of law. *See id.*

As a result, the Court **GRANTS** Zurich's motion regarding Able's claim for breach of the implied covenant of good faith and fair dealing.

///

///

///

///

///

27

# V.      CONCLUSION

For the reasons given above, the Court **GRANTS** Zurich's cross-motion for summary judgment on Able's breach of contract claim as to the CGL issue and **DENIES** Able's motion for partial summary judgment on the same issue.  The Court also **GRANTS** Zurich's motion for summary judgment on Able's claim for breach of the implied covenant of good faith and fair dealing.

This order disposes of Docket Nos. 59 and 67.


**IT IS SO ORDERED**.


Dated: January 8, 2021

_____
EDWARD M. CHEN
United States District Judge